IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

AUTUMN TIBBS,                          )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )          NO. 13-3193
                                       )
STATE OF ILLINOIS                      )
ADMINISTRATIVE OFFICE OF               )
THE ILLINOIS COURTS, LESLIE            )
GRAVES, and BARBARA MABIE,             )
                                       )
        Defendants.                    )

OPINION

RICHARD MILLS, U.S. District Judge:

The Motion of the Defendants for Summary Judgment is allowed.

This case is terminated.

Here's why:

I. INTRODUCTION

Plaintiff Autumn Tibbs filed a Complaint asserting two separate

federal causes of action.  She alleges, pursuant to 42 U.S.C. § 1983, that

Defendants retaliated against her for exercising her rights under the First

Amendment to the United States Constitution.  She also contends that

Defendants violated her rights under the Family and Medical Leave Act ("FMLA").

The Plaintiff alleges she was employed by Defendant State of Illinois Administrative Office of the Illinois Courts (the "AOIC") as an administrative assistant to the chief judge of the Seventh Judicial Circuit at the time her employment was terminated.

Defendant Leslie Graves is a circuit judge in the Seventh Judicial Circuit of Illinois, serving as the presiding judge of Sangamon County at all times relevant to the claims in this case.  Defendant Barbara Mabie was employed by the AOIC as the Seventh Judicial Circuit court administrator. However, the Plaintiff does acknowledge that the individual Defendants are entitled to summary judgment on the claims that are asserted against them.

The only remaining claims are asserted against the AOIC and are pursuant to the Family and Medical Leave Act.  The Defendants contend that Plaintiff has named the wrong Defendant and the AOIC is not her employer.

## II. FACTUAL BACKGROUND

(A)

Plaintiff Autumn Tibbs became the Administrative Assistant to the Chief Judge of the Seventh Judicial Circuit in December of 2001 or January of 2002.  In that capacity, the Plaintiff was an at-will employee and was physically located in Sangamon County, Illinois.  As an administrative assistant to the chief judge, the Plaintiff was responsible for assigning court reporters into courtrooms, tracking attendance, completing payroll, assisting with the budget, paying bills and working on various other projects as assigned.

Barbara Mabie became the Trial Court Administrator for the Seventh Judicial Circuit in mid-2005 and retired in December of 2012.  The Seventh Judicial Circuit is comprised of the circuit courts in Greene, Jersey, Macoupin, Morgan, Sangamon and Scott Counties in Illinois.

In Illinois, circuit judges are elected and associate judges are appointed to the bench.  The chief judge is the judge who is in charge of the administrative duties of the circuit and, according to the Defendants, is the employer of non-judicial employees of the judicial branch–such as the

Plaintiff.   Citing the AOIC's answer to the complaint, the Plaintiff maintains she was an employee of the AOIC.  The Defendants claim they inadvertently admitted in their answer that Plaintiff was an employee of the AOIC and this stands as a judicial admission for purposes of this motion. However, the AOIC is not the sole employer of the Plaintiff.  The complaint did not allege that the Administrative Office was the sole employer.[1]

The Presiding Judge is the judge who is in charge of day-to-day administrative duties for that county.  At all times materially relevant to the complaint, the Chief Judge in the Seventh Judicial Circuit was on a two-year rotation.

Circuit judges had assigned court reporters and associate judges used reporters from a pool of court reporters.  In November of 2009, the circuit judges and their court reporters were as follows: Kim Neuhoff was assigned to Judge Leo Zappa; Laura Berry was assigned to Judge Patrick Kelley; Marybeth Evans was assigned to Judge John Belz; Andrea Pryor was

---

[1]The Defendants claim that despite the inadvertent admission, they are entitled to summary judgment.  If summary judgment is denied as to the AOIC, that Defendant will seek leave of Court to amend its answer.

assigned to Judge Pete Cavanagh; Tina Riebeling was assigned to Judge John Schmidt; Beth Samet was assigned to Judge Leslie Graves; and Tracey Mahan was assigned to Judge Patrick Londrigan.  The pool court reporters in Sangamon County, Illinois, were Brenda Jones, Debbie Prather, Lynn Ruppert, Robbin Sterr and Nancy Kitchen.

Judge Patrick Kelly was the Chief Judge of the Seventh Judicial Circuit from December of 2008 to December of 2010.  Judge Richard Mitchell was the Chief Judge of the Seventh Judicial Circuit from approximately December 1, 2010 to November 21, 2012.  Judge Leslie Graves was the Presiding Judge of Sangamon County from approximately December of 2010 to November 21, 2012.  Judge Graves was the Chief Judge of the Seventh Judicial Circuit from approximately November 22, 2012 to December 1, 2014.

In 2009, the Associate Judges in Sangamon County, Illinois included Judges Steve Nardulli and Robert Hall.  Prior to November 9, 2009, the pool reporters complained that the reporters for the circuit judges got special treatment and the reporters for the circuit judges thought that the

pool reporters complained all the time.

The court reporters in Sangamon County were divided into three groups: Lynn Ruppert and Debbie Prather were pool reporters in one group; Nancy Kitchen and Tina Riebeling were pool reporters in a group that advocated a more neutral position, and Kim Neuhoff, Laura Berry, Marybeth Evans, Andrea Pryor, Beth Samet and Tracy Mahan were reporters for the circuit judges in a group that was in opposition to the Ruppert/Prather group.

Before a meeting on November 9, 2009, the pool reporters were complaining that the workload was unfair. They claimed to have more work than the reporters for the circuit court judges, and that the reporters for the circuit court judges got special treatment.

Trial Court Administrator Barb Mabie had meetings with the various chief judges, during their terms as Chief Judge of the Seventh Judicial Circuit, and asked about having all court reporters in Sangamon County be in a pool and work for all of the judges, rather than certain court reporters being assigned to circuit judges. Neither Chief Judge Robert Eggers nor

Chief Judge Patrick Kelley were receptive to the idea.

In 2009, Chief Judge Kelley had a meeting with all of the court reporters about their complaints of work assignments and his response was that they needed to quit complaining, get to work and accept any assignment. After the meeting, the work atmosphere did not improve.

On March 1, 2011, after Associate Judge John Childress had a difficult time obtaining a court reporter for a trial, the Plaintiff sent an email to the court reporters and asked them to keep her idea of assigning court reporters quiet. The Plaintiff proposed placing all of the court reporters into categories based upon the amount of work they were performing so that each court reporter could assist judges other than the judge to whom she was regularly assigned. The Plaintiff did not discuss the topic of the email with Chief Judge Richard Mitchell, Presiding Judge Leslie Graves or Trial Court Administrator Barb Mabie before the Plaintiff sent the communication to the court reporters.

The Plaintiff admits that her idea to categorize the court reporters could be viewed as a pool or rotation of court reporters, although that was

not what she intended.  Judge Zappa saw the Plaintiff's March 1, 2011 email and thought that Plaintiff intended to pool all of the court reporters. In response to the Plaintiff's March 1, 2011 email, Judge Zappa sent an email expressing his displeasure with the Plaintiff's idea of a full rotation for court reporter assignments.

Barbara Mabie learned about the Plaintiff's idea to pool the court reporters because she was included on the list of recipients of the March 1, 2011 email sent by Judge Zappa and was shocked that Plaintiff had tried to secretly implement a pool when the Circuit Court judges had previously rejected the idea on multiple occasions.  Mabie discussed her surprise with the Plaintiff about her attempt to pool the court reporters.  The Plaintiff apologized to Mabie for her conduct and explained that she was not trying to implement a full rotation.  Mabie accepted the apology of the Plaintiff.

The Plaintiff claimed that she felt humiliated at Judge Zappa's response and therefore met with Barb Mabie and Presiding Judge Graves in the early morning of March 4, 2011, before others reported to work.  The Plaintiff was upset at the reaction of Judge Zappa and knew she had made

a mistake in attempting to reorganize the court reporters.

At the March 4, 2011 meeting, the Plaintiff expected to be disciplined for the attempt to reorganize the court reporters. At that meeting with Judge Graves and Barbara Mabie, the Plaintiff explained her intent to reorganize the court reporters, after which Judge Graves appeared to be disappointed with her, though not angry and still supportive of the Plaintiff.

(B)

After the March 4, 2011 meeting, the Plaintiff could not pull herself together so Barbara Mabie suggested that Plaintiff contact her counselor to make an appointment that day. Based on that suggestion, the Plaintiff left work and did not return until after taking leave pursuant to the Family and Medical Leave Act ("FMLA"). On March 9, 2011, the Plaintiff requested and was granted leave pursuant to the FMLA. Although the Plaintiff initially requested a leave of absence pursuant to the FMLA until April 14, 2011, she requested and was permitted an extension of FMLA leave until May 1, 2011, when she was permitted to return to work on a part-time

basis from May 1, 2011, to September 2, 2011.

When Autumn Tibbs returned to work in September of 2011 after her first FMLA leave of absence, which included part-time employment for four months, Trial Court Administrator Barb Mabie tried to put the incident with Tibbs and the court reporters behind her and felt the relationship with Tibbs was professional and cooperative.  No one objected to the Plaintiff's FMLA leave of absence from March 9, 2011, to May 1, 2011.  No one objected to the Plaintiff working on a part-time basis between May 1, 2011 and September 2, 2011.

Although the Plaintiff was asked to return to full-time duty by Judge Graves effective August 24, 2011, Chief Judge Mitchell granted the Plaintiff an extension until September 2, 2011, to obtain the necessary documents from her physician/counselor to return to work full time.  At the time, the Plaintiff felt that Judge Mitchell was supporting her.

In and around May of 2012, the Plaintiff chose to associate with former court reporters Lynn Ruppert, Robbin Sterr and Debbie Prather in their complaints about other courthouse staff.  Lynn Ruppert retired as a

court reporter from the Sangamon County courthouse in October of 2011. Robbin Sterr left her employment at the Sangamon County courthouse in or around June of 2010.  On May 4, 2012, Debbie Prather gave notice to Chief Judge Mitchell that she was resigning as a court reporter from the Sangamon County courthouse effective May 31, 2012.

The Sangamon County courthouse law library is located on the sixth floor of the courthouse in the city of Springfield and was staffed by a librarian.  In or around May, 2, 2012, the Sangamon County courthouse librarian was fired after she provided confidential information to her relative about an outstanding warrant.  Several boxes of books began to accumulate in the law library and  Barbara Mabie told the Plaintiff and another employee to unpack and shelve the books.  The Plaintiff advised Mabie that she did not need any assistance with the project.

The Plaintiff took a second FMLA leave of absence from June 7, 2012 August 30, 2012.  This was before she unpacked or shelved any of the books in the law library.

The courtrooms in the Sangamon County courthouse are located on

11

the fifth, sixth and seventh floors.  In the Sangamon County courthouse, there is a vault in a secured area in the basement where court reporter notes (which include tapes from stenographic machines) and jury and administrative files are kept.  After a court reporter retires or leaves employment, she may be asked to transcribe her court reporter notes.  If a court reporter at the Sangamon County courthouse leaves employment, her hearing and trial notes are kept in a vault in the Sangamon County courthouse.

Prior to June 1, 2012, if a court reporter (whether or not she was still an employee) wanted to access her notes, the court reporter would obtain a key to the vault, retrieve the notes and return the key to the Trial Court Administrator's Office.  Between May 7 and 11, 2012, Lynn Ruppert contacted the Plaintiff to retrieve stenographic notes from the vault so that Ruppert could prepare a transcript.  Ruppert could not find her stenographic notes the week of May 7, 2012, despite looking in several locations around the Sangamon County courthouse, including the vault. Between May 21 and 25, 2012, Lynn Ruppert and the Plaintiff looked in

the vault of the Sangamon County courthouse for Ruppert's stenographic notes, but neither the Plaintiff nor Ruppert could find the notes.

On May 24, 2012, Chief Judge Mitchell met with the Plaintiff and told her that she needed to do her job and follow directions.  The Plaintiff testified that as of May 25, 2012, Judge Graves advised her that Sandra Merrill was to handle all vault requests.

(C)

On May 29, 2012, the Plaintiff searched by herself for Lynn Ruppert's notes in the Sangamon County courthouse vault.  The Plaintiff found the stenographic notes Ruppert was attempting to locate in a box that was labeled on one side as "Jury Commission" and on the other side as "Lynn Ruppert" and some dates.  The Plaintiff took the stenographic notes to her office, called Lynn Ruppert, then took a black Sharpie and marked out the words "Jury Commission" on one end of the box.

Lynn Ruppert came to the courthouse and took the stenographic notes, then asked the Plaintiff to take Ruppert to the vault where the notes had been located.  Ruppert asked the Plaintiff to replace the box on the

13

shelf with the marked out words "Jury Commission" showing from where they were standing and the Plaintiff complied with that request. Ruppert then took a photograph of the box on the shelf with the marked out words "Jury Commission" showing. The Plaintiff and Ruppert then turned the box around on the shelf so that the writing on the box indicated to an observer that it contained the notes of Lynn Ruppert.

Lynn Ruppert made a complaint to Trial Court Administrator Barb Mabie claiming that there had been a security breach and accused unidentified staff of moving and tampering with the box of her stenographic notes. Ruppert also advised Mike Tardy, the Director of Administrative Office of the Illinois Courts, of Ruppert's accusations that someone had tampered with her stenographic notes at the Sangamon County courthouse. Additionally, Ruppert sent Mabie an email message advising her of the correspondence between Tardy and Ruppert.

On May 30, 2012, Barbara Mabie advised Sangamon County court security of the allegations of Lynn Ruppert. Because of the incident involving the stenographic notes of Ruppert, an internal investigation was

conducted and the security staff recommended the implementation of a new procedure for entry into the vault and removing files or documents.

On June 1, 2012, the new written procedure was implemented to retrieve information from the vault where court reporter notes were stored. The policy provided that the court reporter was required to sign a log indicating what was being requested and was required to be accompanied by the trial court administrator or her secretary.

In late May or early June of 2012, Chief Judge Mitchell was informed about allegations of a security issue in the Sangamon County Courthouse vault, which were being investigated by court security.  Judge Mitchell was advised upon completion of the investigation of the vault incident that Plaintiff had escorted Lynn Ruppert to the vault.

(D)

Between June 5, 2012 and June 7, 2012, Judge Graves discussed with Chief Judge Mitchell whether to serve a pre-hearing notice in which discipline was contemplated against the Plaintiff for the alleged insubordination in escorting Lynn Ruppert to vault area.  Chief Judge

Mitchell believed that by disobeying an order to not escort court reporters to the vault area, the Plaintiff had demonstrated insubordination which warranted discipline, particularly after his May 24, 2012 meeting with the Plaintiff at which he told her she needed to do her job and follow directions. The Plaintiff disputes that insubordination occurred. Moreover, Chief Judge Mitchell was given erroneous information about what Judge Graves had said to the Plaintiff.

Before disciplinary charges could be drafted to address the Plaintiff's conduct, she took a leave of absence pursuant to the FMLA. At her deposition, the Plaintiff testified she should not have taken Lynn Ruppert to the vault, after she was previously advised that Sandra Merrill was to escort court reporters to the vault.

Chief Judge Mitchell resisted disciplining the Plaintiff for earlier misconduct because she had previously been a good employee and he hoped she could overcome her personal problems. He did not commence disciplinary proceedings against the Plaintiff during her leave of absence, because he did not want to interrupt her leave and had concerns for her

16

health.

Prior to the return of the Plaintiff on August 30, 2012 from her leave of absence, Judge Graves spoke with Chief Judge Mitchell and then drafted and signed a letter dated August 30, 2012, delineating alleged misconduct of the Plaintiff for the May 29, 2012 trip to the vault area.  In the August 30, 2012 letter, Judge Graves included past incidences of conduct in which the Plaintiff had engaged, which included the March 3, 2011 email to court reporters; an August of 2011 incident in which the Plaintiff was directed to meet with Judge Graves, when the Plaintiff instead contacted Judge Mitchell; and making disparaging comments about her co-workers. According to her Affidavit, Judge Graves included the Plaintiff's past conduct because she believed it to be an aggravating factor.

When Chief Judge Mitchell and Judge Graves discussed the drafting of the letter to the Plaintiff dated August 30, 2012, Judge Mitchell did not indicate what discipline he might consider, so Judge Graves stated that disciplinary measures could include discharge.

The Plaintiff returned from a second leave of absence pursuant to an

FMLA request on August 30, 2012. On that date, Judge Graves provided the Plaintiff with a notice of a pre-disciplinary hearing, which contained a statement that Plaintiff was being placed on paid administrative leave because of the alleged misconduct in which she had engaged prior to going on FMLA leave.

The Plaintiff's pre-disciplinary notice provided she was invited to a pre-disciplinary meeting with Chief Judge Mitchell on September 6, 2012, and/or provide a written statement at or before the meeting. The meeting was an opportunity to respond to allegations of insubordination for sending a March 3, 2011 email to all Sangamon County courthouse court reporters which changed the policy and daily operations of court reporter assignments; insubordination and conduct unbecoming a judicial employee for contacting Judge Mitchell in August of 2011, instead of contacting Judge Graves, as instructed, to discuss returning to full-time employment status; insubordination, bringing the Court into disrepute or attempting to discredit the Court, and conduct unbecoming a judicial employee for failing to inform her supervisor the week of May 11, 2012, of a box that was

missing from the vault area; insubordination, bringing the Court into
disrepute or attempting to discredit the Court, and conduct unbecoming a
judicial employee for escorting a former employee to the vault area when
she was instructed not to be an escort; and making disparaging remarks
about co-workers.

According to his Affidavit, Chief Judge Mitchell believed that the
insubordinate acts of Plaintiff Tibbs from 2011 were relevant to the severity
of the discipline which might be imposed and that these acts were needed
to be included in the charges.  The Plaintiff was invited by Judge Mitchell
to attend the pre-disciplinary meeting on September 6, 2012.   After
receiving the pre-disciplinary notification on August 30, 2012, the Plaintiff
was immediately placed on paid administrative leave pending her meeting
on the charges of misconduct with Chief Judge Mitchell.

Chief Judge Mitchell stated that, prior to the meeting on September
6, 2012, he had not made a decision on whether or what type of discipline
to impose against the Plaintiff.  The Plaintiff claims that evidence suggests
a decision might have already been made.  Moreover, the Plaintiff alleges

there are statements which suggest Judge Graves played a major role in the disciplinary decision.

The Plaintiff was afforded the opportunity to submit a written statement to the charges and directed the Plaintiff to attend the pre-disciplinary meeting.   The Plaintiff did not attend the pre-disciplinary hearing on September 6, 2012.

Chief Judge Mitchell terminated the Plaintiff's employment affective September 12, 2012.  The Defendants allege the reason for the termination was that Plaintiff offered no evidence to contradict or explain the allegations and because she refused to comply with the direction that she meet with Judge Mitchell.  He did not make the decision to discharge the Plaintiff until after she refused to attend the pre-disciplinary meeting.

The Defendants allege that, at all times materially relevant hereto, Chief Judge Mitchell was the employer of the Plaintiff.  Relying on the Defendants' answer to her complaint, the Plaintiff contends that the AOIC was her employer.  The Defendants reply by noting that the complaint did not allege that the AOIC was the sole employer of the Plaintiff and, because

there is no admission to the contrary, they claim Judge Mitchell can be a joint employer.

The Defendants further assert that, although Chief Judge Mitchell was the employer of the Plaintiff, Trial Court Administrator Barb Mabie and Presiding Judge Leslie Graves supervised the day-to-day functions and had authority to issue directives to the Plaintiff, which she was obligated to follow. The Plaintiff disputes the allegation, reiterating that the AOIC was her employer and, further, that her daily supervisor was Mabie until the Plaintiff was told she was not to have contact with her. The Defendants reiterate that Chief Judge Mitchell was at least a joint employer.

Following her termination, the Plaintiff filed a complaint asserting an FMLA violation. The Defendants move for summary judgment on the basis that the AOIC was not her employer. Assuming the AOIC was the Plaintiff's employer, the Defendants contend they are entitled to summary judgment because she cannot meet each FMLA element.

## III. LEGAL DISCUSSION

### A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. See id.

### B. First Amendment claims

As noted previously, the Plaintiff is not contesting the Defendants' Motion for Summary Judgment as to the First Amendment claims against Judge Graves and Barbara Mabie. Therefore, summary judgment will be

entered in the Defendants' favor on the Plaintiff's First Amendment claims.

### C. FMLA claims against Administrative Office of Illinois Courts

(1)

The Plaintiff's Complaint also asserts that the Administrative Office of Illinois Courts, her employer, violated her rights to reinstatement under the FMLA when it failed to reinstate her when she was scheduled to return from her leave.  The Plaintiff also contends this constituted retaliation for exercising her rights under the FMLA.

The Defendants claim that the AOIC was not the Plaintiff's employer. The AOIC is the only Defendant named by the Plaintiff for an alleged FMLA violation.

The Family Medical Leave Act entitles an eligible employee to take up to 12 weeks of leave because, inter alia, the employee is unable to perform the functions of the job because of a serious health condition.  See 29 U.S.C. § 2612.  An eligible employee is entitled to be restored to his or her former position or an equivalent upon return from leave.  See 29 U.S.C. § 2614.  The FMLA also prohibits retaliation against an employee who

exercises her FMLA rights.  See Burnett v. LFW, Inc., 472 F.3d 471, 477 (7th Cir. 2006).

Under that Act, it is unlawful for an "employer" to interfere with or deny FMLA rights or discriminate against an employee who has exercised those rights.  29 U.S.C. § 2615.  The Defendants contend that, because the Plaintiff has not named the Chief Judge of the Seventh Judicial Circuit as a Defendant and because no other employee of the AOIC made the decision to terminate the Plaintiff's employment, the Defendant is entitled to summary judgment.

Paragraph 8 of the Plaintiff's Complaint states as follows:

Tibbs was employed by the AOIC as an administrative assistant to the chief judge of the Seventh Judicial Circuit at the time her employment was terminated.  She commenced her employment with the AOIC in February of 1998 and, at that time was employed as a secretary.  Ultimately, she was promoted to the administrative assistant to chief judge position in January of 2002.  Her employment was terminated on September 12, 2012.

See Doc. No. 1, ¶ 8.  The Defendants' Answer states, "Defendants admit the allegations contained in ¶8 of the plaintiff's complaint."  See Doc. No. 8, ¶ 8.

24

The Plaintiff is correct that a defendant's answer which admits a complaint's allegation constitutes a "binding judicial admission." See Crest Hill Land Development, LLC v. City of Joliet, 396 F.3d 801, 805 (7th Cir. 2005) (citing Keller v. United States, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995)).  The Defendants note that the complaint did not allege that the AOIC was the sole employer of the Plaintiff.  Because there was no dispute to the issue upon the Defendants' admission, however, the Plaintiff claims that she had no reason to conduct discovery on the issue of whether the AOIC was her employer.

Consistent with the applicable regulation, however, the United States Court of Appeals for the Seventh Circuit has recognized that a joint employer relationship may exist for purposes of determining liability under the FMLA.  See Moldenhauer v. Tazewell-Pekin Consol. Communications Center, 536 F.3d 640, 644 (7th Cir. 2008) (citing 29 C.F.R. § 825.106).  The court held "generally that for a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee, although the ultimate determination will vary depending on

the specific facts of each case." Id.  In considering the issue pursuant to the Americans with Disabilities Act, the Seventh Circuit has held, "Factors to consider in determining joint employer status are (1) supervision of employees' day-to-day activities; (2) authority to hire or fire employees; (3) promulgation of work rules and conditions of employment; (4) issuance of work assignments; and (5) issuance of operating instructions." Whitaker v. Milwaukee County, 772 F.3d 802, 810 (7th Cir. 2014) (citation omitted).

The Defendants allege that despite their admission, the application of these factors suggests that the chief judge was the Plaintiff's employer. Although some tasks may have been delegated to the presiding judge and Trial Court Administrator Barbara Mabie, the chief judge had the power to hire and fire and controlled the Plaintiff's working conditions.  Upon considering the factors, the Court concludes that Chief Judge Mitchell, and not the AOIC, was the Plaintiff's employer.

As the Defendants assert, however, even if the AOIC also was the Plaintiff's employer, there is no basis for holding that entity liable.  See

Whitaker, 772 F.3d at 811-12 (holding in an ADA case that one joint employer cannot be held liable for the actions of another employer).  The Plaintiff would have to show that the Defendants terminated her employment to prevent her from exercising her right of reinstatement.  See Simpson v. Office of the Chief Judge of the Circuit Court of Will County, 559 F.3d 706, 712 (7th Cir. 2009) ("Firing an employee to prevent her from exercising her right to return to her prior position can certainly interfere with that employee's FMLA rights.").  The AOIC had no role in the employment decision.  The decision to terminate the Plaintiff was not made by an AOIC employee.  Chief Judge Mitchell, an elected official, made the decision.

Although the Defendant's inadvertent admission as to the Plaintiff's employer is somewhat unfair to the Plaintiff, the Court presumes that if the AOIC was her true employer, some evidence would have resulted in discovery.  The fact that it did not suggests that the AOIC is not her employer and is not the appropriate Defendant for an FMLA claim.  Accordingly, it would be equally unfair to subject Defendant AOIC to

potential liability for a decision in which it had no involvement.

(2)

Even if it were the proper Defendant, the AOIC would be entitled to summary judgment because the Plaintiff lacks evidence to establish her claim.  An employee is not entitled to return to her prior position if she would have been terminated regardless of whether she took FMLA leave. See Simpson v. Office of Chief Judge, 559 F.3d 706, 712 (7th Cir. 2009).

The Plaintiff's reinstatement and retaliation claim turn on the same event–her termination when she was eligible to return to work following her FMLA leave.  To establish a prima facie case under the direct method, a plaintiff must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."  Langenbach, 761 F.3d at 799 (citation omitted).  The causal connection may be shown by a direct admission from the employer or circumstantial evidence which "can include suspicious timing, ambiguous statements from which retaliatory intent can be inferred, evidence of similar employees being treated differently, or evidence that the

employer offered a pretextual reason for the termination." Id. at 800.  At

this stage, the "circumstantial evidence must point directly to the

conclusion that an employer was illegally motivated, without reliance on

speculation." Id. (internal quotation marks and citation omitted).

Under the indirect method, the plaintiff may present evidence (1) she

was meeting her employer's legitimate expectations; (2) she suffered an

adverse employment action; and (3) similarly situated employees who did

not request FMLA leave were treated more favorably.  See id.  Because the

Plaintiff has not pointed to any evidence that another employee who

engaged in similar conduct and did not request FMLA leave was treated

more favorably, the Plaintiff cannot establish a prima facie case under the

indirect method of proof.

As for the direct method, the only issue is whether there is a causal

connection between the Plaintiff's FMLA leave and her discharge.  Because

there is no direct admission from the employer, the Court will consider

whether the Plaintiff can meet her burden with circumstantial evidence.

The Plaintiff relies primarily on suspicious timing.  Her termination

occurred approximately two weeks after the Plaintiff's return from FMLA leave.  In this case, there is a reasonable explanation for the timing.  The Plaintiff's employer learned of her insubordination after Lynn Ruppert claimed someone was moving and tampering with her notes.  This occurred just before the Plaintiff's leave and was the subject of discussion between Chief Judge Mitchell and Judge Graves at the time of the Plaintiff's leave. No decision was made while the Plaintiff was on FMLA leave.  Chief Judge Mitchell stated he did not wish to commence disciplinary proceedings against the Plaintiff during her leave of absence because he was concerned for her health and did not want to interrupt her leave.

A pre-disciplinary hearing was set soon after the Plaintiff returned to work.  After the Plaintiff refused to meet with Chief Judge Mitchell and did not participate in the disciplinary process, a decision was made to terminate her employment.  Accordingly, the discovery of the conduct giving rise to her eventual termination occurred in close proximity to the beginning of the Plaintiff's leave and her termination occurred soon after she returned. Upon discovering the conduct, Chief Judge Mitchell offered a legitimate

and uncontested reason for waiting to take any action on discipline. Accordingly, the Court is unable to conclude that the timing was suspicious.

The Plaintiff further contends that the Defendants also purport to justify her termination by providing allegations from instances that had occurred long before.  The Plaintiff contends this is suspicious because if those incidents warranted discipline, then a jury could conclude that Plaintiff would have been disciplined at the time.  The Plaintiff suggests that the Defendants, in waiting until she took FMLA leave, terminated her for that reason.

As for the examples of prior misconduct, the undisputed testimony is that Judge Graves included that information because she believed those instances constituted aggravating factors.  The Court is unable to conclude that an employer's consideration of past misconduct–even if undisciplined at the time–is suspicious or a pretext for a discriminatory reason when the employer is making an employment decision.  The employer may well have thought that the prior examples, standing alone, did not warrant discipline. The Court has no basis to secondguess that decision.

To the extent that Plaintiff argues she did not violate a written policy, it is undisputed that she violated an oral directive from Judge Graves. Four days after being told Sandra Merrill was to handle all vault requests, the Plaintiff violated the new policy by escorting Lynn Ruppert to the area. The Plaintiff testified as follows:

> Q.   Now, you were advised that as of the 25th that Sandra should handle all of the vault requests, is that correct?
> A.   Yes.
> Q.   But you took Lynn down to the vault after you had notification on May the 25th that Sandra was supposed to comply with those requests - -
> A.   I did.
> Q.   - - to go down to the vault?
> A.   I did, and I shouldn't have.

See Doc. No. 15-1, at 217-18. Accordingly, the Plaintiff testified that she did violate an order. The Plaintiff chose not to dispute the charges by meeting with Chief Judge Mitchell.

The Plaintiff essentially forfeited her right to contest the charges by not meeting with her employer. She contends this is because a decision had already been made. The Defendants deny that a decision had been made. However, the Court need not speculate on whether the Plaintiff could have

saved her job by offering a legitimate reason for the violation or by apologizing and showing remorse.  The Plaintiff is unable to meet her prima facie case.

The Plaintiff has not presented evidence pointing directly to the conclusion that the Defendant had a discriminatory reason for terminating her employment.   Such a conclusion would be based entirely on speculation, which is not permitted.  See Langenbach, 761 F.3d at 800. Because there is no such evidence of discrimination under the FMLA, the Defendants are entitled to summary judgment under the direct method of proof.

## IV. CONCLUSION

The Plaintiff has acknowledged that summary judgment is warranted on her First Amendment claims against the individual Defendants. Regardless of whether the AOIC is the appropriate Defendant on her FMLA claims, the Plaintiff cannot assert a prima facie case for reinstatement or retaliation under either the direct or indirect method of proof.  Accordingly, the Defendants are entitled to summary judgment on all claims.

<u>Ergo</u>, the Defendants' Motion for Summary Judgment [d/e 14] is ALLOWED.

Judgment will be entered in favor of the Defendants and against the Plaintiff.

Upon the entry of Judgment, the Clerk will terminate the case.

ENTER: February 25, 2016

FOR THE COURT:

/s/ Richard Mills
Richard Mills
United States District Judge

34